IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 20-CR-1864-KWR |
| vs. ) | |
| ) | |
| ROBERT BENJAMIN NELSON, ) | |
| ) | |
| Defendant. ) | |

### UNITED STATES' SENTENCING MEMORANDUM

THE UNITED STATES OF AMERICA, by and through its undersigned attorneys, respectfully submits this Sentencing Memorandum for the Court's consideration. For the reasons summarized herein, the appropriate sentence in this case includes: a term of 240 months of imprisonment for Count 1; the mandatory minimum consecutive term of 120 months of imprisonment for Count 4; supervised release to follow the terms of imprisonment; full restitution; and forfeiture as alleged in the Superseding Indictment and stipulated in the parties' Plea Agreement.

### PROCEDURAL SUMMARY

On September 12, 2020, a Criminal Complaint and was filed alleging ROBERT BENJAMIN NELSON ("Defendant") committed violations of 18 U.S.C. § 1114, attempted murder of a federal agent, and 18 U.S.C. § 924(c), use of a firearm during and in relation to a federal crime of violence. Doc. 1. Defendant was arrested on September 16, 2020, on the Complaint. Doc. 2. On October 14, 2020, a federal grand jury returned an Indictment alleging

1

Defendant committed those same crimes. Doc. 15.

Following robust pretrial litigation, Defendant proceeded to trial beginning on January 9, 2023. Doc. 160. After a jury failed to reach a unanimous verdict due to a single hold-out juror, the Court entered a Mistrial Order on January 17, 2023. Doc. 165.

Following the first trial, a federal grand jury returned a Superseding Indictment on January 25, 2023, adding charges of assault on a federal agent with a deadly weapon and assault on a federal agent resulting in bodily injury, each in violation of 18 U.S.C. § 111(b). The Superseding Indictment also contained additional charges of use and carrying of a firearm during and in relation to a federal crime of violence in violation of 18 U.S.C. § 924(c) to correspond to each of those two new assault charges. Doc. 171. The new charges increased the maximum incarceration Defendant was facing by twenty years.

Following additional motions practice and the filing of trial documents for the re-trial of this case, Defendant and the UNITED STATES reached a Plea Agreement, which was accepted by the Court on March 22, 2023. Docs. 208-209. A Presentence Investigation Report ("PSR") was disclosed in this case on May 25, 2023. Doc. 211.

## FACTUAL SUMMARY

The UNITED STATES is in receipt of the PSR. The UNITED STATES has no substantive objections thereto and agrees with the factual summary presented in the PSR at ¶¶ 10-23. Defendant has not objected to the factual paragraphs of the PSR. Doc. 218. This Court should therefore adopt the factual findings contained in the PSR.

**DISCUSSION**

**I. Defendant's attempt to murder a law enforcement officer
should be punished by 240 months of imprisonment.**

Defendant's Offense Level under the United States Sentencing Guidelines (U.S.S.G.) has been accurately calculated in the PSR. Defendant has a Final Offense Level of 45 (reduced to 43 by U.S.S.G. § 5A note 2) and a Criminal History Category of I, making his advisory Guidelines imprisonment range Guidelines range for attempted murder of a federal agent "life." However, because that offense carries a statutory maximum penalty of 240 months, the PSR lists the Guideline term of imprisonment for Count 1 as 240 months per U.S.S.G. § 5G1.2(b). PSR ¶ 65. Additionally, the charge in Count 4 that Defendant discharged a firearm in furtherance of a federal crime of violence in violation of 18 U.S.C. § 924(c) carries a statutory minimum term of 120 months that must run consecutive to the sentence for any other crime. *Id*. Because the penalty for Count 4 is mandated by law, this memorandum will focus on argument and analysis related to Count 1.

"The goal of the Sentencing Guidelines is, of course, to reduce unjustified disparities and so reach toward the evenhandedness and neutrality that are distinguishing marks of any principled system of justice." *Koon v. United States*, 518 U.S. 81, 113 (1996). As the Tenth Circuit explained, "[t]he federal courts have been striving towards this worthy goal since 1987" and "this goal remains the same post-Booker." *United States v. Gonzalez-Huerta*, 403 F.3d 727, 738 (10th Cir. 2005).

The Guidelines are not the ending point in the sentencing analysis, but they are the starting point and one factor for the Court to consider in fashioning a sentence that is "sufficient,

3

but not greater than necessary," to achieve the sentencing goals of 18 U.S.C. § 3553. Section 3553 identifies factors that sentencing judges should be considered when imposing a sentence. A reasonable sentence is one that "reflect[s] the seriousness of the offense, promote[s] respect for the law, provide[s] just punishment, afford[s] adequate deterrence to criminal conduct" and protect[s] the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(B), (C); see also *United States v. Booker*, 543 U.S. 220 (2005) (the sentencing guidelines avoid unwarranted sentence disparities among defendants who have been found guilty of similar misconduct).

    Here, Defendant's Final Offense Level is 43 not because the Guidelines are somehow draconian in how they treat any attempt to kill a federal government employee, but because of the specific characteristics of *this particular* attempt to murder a federal agent. Defendant's Base Offense Level is 33 rather than 27 because of the deliberate manner in which he decided to murder S.D., and the malice aforethought with which he executed his cold-blooded plan.[1] Additional aggravating facts warrant upward enhancements and adjustments because of the permanent, life-changing injuries S.D. suffered in the attack (+4); the fact that she was a federal agent targeted for this attempted murder because of her faithful execution of her law enforcement duties (+6); and the recklessness with which Defendant fled his attempt to murder her and the fact that he readied an AK-47 style rifle to prepare for a follow-on engagement to escape capture, abandoning his plan for further violence only when keen-eyed patrol officers from Laguna Pueblo arrived to back S.D. up (+2).[2]

---

[1] Defendant has not objected to the determination in PSR ¶ 29 that he is guilty of attempted first-degree murder.
[2] Defendant has objected to each of these offense-level enhancements, the United States has responded, and the Probation Office has filed an addendum addressing the objections.

It is these characteristics—the egregious features of Defendant's attempt to murder S.D.—that culminate in the Guidelines calculations set forth in the PSR. The facts and circumstances described numerically and precisely by the Guidelines provides the foundation from which the Court begins its analysis. But there are additional factors and circumstances, not accounted for by the Guidelines, that put further upward pressure on what sentence justice demands. Defendant has described in his own words (to evaluators, rather than in open court) how he holds in his heart animosity towards the police. He described how as soon as he saw S.D. pull out in her patrol unit from the highway median, he slowed down to increase the distance between his truck and his parents' RV he was following, yet claimed he was afraid for his life because he had no idea why a police officer would pull him over. He claimed that he pulled into traffic after shooting S.D. because she was shooting at him, but the video the Court and the jury saw clearly shows that he began to speed away from the scene of the attempted murder before S.D. was able to regain her feet and draw her sidearm after Defendant's cold-blooded ambush. Defendant's continuing animosity towards police, and his self-serving dishonest statements to attempt to justify his crime, show a total lack of remorse that demands significant punishment to protect the public and address the seriousness of the offense as § 3553(a) requires.

Avoiding unwarranted sentencing disparities, as § 3553(a)(6) addresses, counsels a Guidelines sentence. It is not a mandate, otherwise a district court could never vary, which is not the law. Nor does it put unfettered upward pressure on a sentence. But it does counsel restraint in considering any request for a variance.

After the Court starts its analysis with the correct Guidelines calculations, and after the

Court weighs and assesses all the facts and circumstances of the offense learned at trial and in pre- and post-trial briefing, the Court should impose a sentence of 240 months for Count 1, Defendant's attempt to murder S.D.

## II. Defendant's request for a term of 120 months of imprisonment is not supported by the law or fact.

Defendant writes that "the parties have agreed that a sentence of 120 months in the custody of the United States Bureau of Prisons is sufficient but not greater than necessary to meet the ends set forth in 18 U.S.C. § 3553." Doc. 218, p. 7. That is untrue. The UNITED STATES and Defendant have entered into a Plea Agreement wherein the parties agree that the appropriate term of imprisonment in this case is between 120 and 360 months. Doc. 208.[3] The United States opposes Defendant's requested sentence of 120 months' imprisonment, which represents the mandatory penalty for Count 4 and zero penalty for Count 1, as it is an extreme variance which is not supported by the facts of this case.

While there is no "rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence," *Gall v. United States*, 552 U.S. 38, 47 (2007), "the justification [for any variance must be] sufficiently compelling to support the degree of variance." *Id*. at 50. It is "uncontroversial that a major departure should be supported by a more significant justification than a minor one." *Id*. Because there is no convenient mathematical way to put a number of months on "life," the Court may find useful the Guidelines range of 360-life that corresponds to Final Offense Level 42. The

---

[3] Defendant's memorandum does note the parties have agreed to a range of "10-30," which is accurate.

240-month maximum sentence for Count 1 would already represent a 33% downward variance from the low end of that range (which itself is the range that would apply to a Final Offense Level three levels less severe than Defendant's). Yet that seems not to be enough for Defendant, who requests a 100% downward variance to zero punishment for his attempt to murder a federal agent.

None of Defendant's arguments for that requested 100% downward variance should persuade the Court. Defendant argues that past officer-involved shootings are what caused Defendant to believe he needed to kill S.D. *Id*. at 11-12. But even a cursory analysis of the historical shooting case to which Defendant refers shows that it does not justify or even explain his deliberate ambush of S.D. Defendant argues that his personality disorder "was the driving force behind Mr. Nelson's actions the day he [attempted to murder S.D.]" Doc. 218, p. 11. The Court and the jury heard at trial how Defendant's personality disorder is different from the kind of severe mental health ailment that could drive someone to involuntary or non-volitional action such as shooting someone with the intent to kill. Then, with respect to just punishment, Defendant argues that a sentence closer to the advisory Guidelines range would be unjust because he is no longer the same man who attempted to kill her. *Id*. at 21-22. Other than his realization that he faces punishment, however, he has not demonstrated any meaningful character development during this litigation.

### A. Defendant's self-education in officer-involved shootings does not justify his actions nor a 100% variance for Count 1.

Defendant now claims that "[t]he only knowledge that Mr. Nelson had of law enforcement came from the videos he was watching while hunched over his computer room in

his parents' house." Doc. 218 at 11. That is difficult to square with Dr. Viljoen's testimony at trial about the anti-law-enforcement culture in Defendant's family, and the belief of Defendant and his family members that law enforcement tricked Defendant's brother into being sent to prison because of a false confession. Tr. 538.[4] Nevertheless, Defendant now argues that he fixated on the January 2016 killing of civilian Daniel Shaver, who was unarmed and actively attempting to comply with police commands, by Officer Philip Brailsford, who was charged with murder but acquitted by a jury. Because he was a civilian in an encounter with a uniformed police officer, Defendant claims, he perceived himself to be in a similar situation when S.D. pulled him over on the morning of September 12, 2020, as Mr. Shaver had faced that fateful night in 2016.

Further review, however, reveals that Defendant has almost nothing in common with Mr. Shaver, the victim of that tragic homicide. Unlike Mr. Shaver, Defendant never received any commands from S.D., instead choosing to lie in wait to ambush her before she could speak two words to him. Unlike Mr. Shaver, Defendant never begged not to be shot nor gave any contemporaneous outward indication he was in fear; the only expression on his face was a smirk when he was taken unharmed into custody. Like Philip Brailsford, Defendant claims to have perceived a person with no weapon in their hands as presenting an imminent threat. Like Brailsford, Defendant now requests benefits because he has been diagnosed with Post-Traumatic Stress Disorder developed from the shooting he initiated (as the Court heard about from Dr.

---

[4] The trial was transcribed with one series of page numbers for the entire trial. Trial transcript pages 538 appears on the January 11, 2023, volume, page 87 of the Portable Document Format (PDF) file for that day's portion of the transcript.

Viljoen at the unsealed *Daubert* hearing in this case). Defendant became the very thing he had set out to destroy.

It may be true that Defendant trained himself to fear and hate police over the years, through his choice of which media to consume or which online content he would give his attention. But that choice does not mitigate his offense conduct. Indeed, his malice aforethought upon beginning any police encounter counsels a higher sentence, rather than a more significant downward variance than his plea agreement already grants him.

### B. A personality disorder does not justify Defendant's actions nor a variance from the Sentencing Guidelines range for Count 1.

As the Court and the jury learned at trial, Defendant has Schizotypal Personality Disorder. Defendant now argues that his personality disorder was the "driving force" behind his attempt to murder S.D. Doc. 218, p. 11. But Court and jury also heard how a personality disorder is less severe than other forms of mental illness, and that Defendant does not suffer from any psychotic disorder. Tr. 583-84.[5] Even the defense expert agreed that Defendant does not suffer from a delusional disorder or other serious mental illness. *Id*. at 553-55.[6] Additionally, Defendant exaggerated his symptoms to try to make himself appear to have more severe mental problems than he actually has. *Id*. at 589-91.[7]

Defendant claims that when S.D. approached his truck at a traffic stop and raised her empty hand to knock at his window, he genuinely believed she was trying to kill him and that he

---

[5] Trial transcript pages 583-84 appear on pages 132-33 of the January 11, 2023, trial session transcript file.
[6] Trial transcript pages 553-55 appear on pages 102-04 of the January 11, 2023, trial session transcript file.
[7] Trial transcript pages 589-91 appear on pages 138-40 of the January 11, 2023, trial session transcript file.

had to defend himself with lethal force. In support of this claim, he argues that he jumped to conclusions about what S.D. would do because of the hours of anti-police videos he chose to watch in the days and months preceding his crimes. But the Court and jury heard how jumping to conclusions, like concluding someone has ill intent when they really do not, is a risk for everyone, not just people with a personality disorder. Tr. 590-92.[8] Even the defense expert testified that jumping to conclusions is not restricted to people with a mental health disorder, that Defendant specifically denied hallucinations, and that anyone can train themselves to be afraid of a certain group of people. *Id*. at 558-62.[9]

Defendant cannot show that his personality disorder caused him to take any action he would not have taken without it, or that it somehow made him unable to appreciate what he was doing or why it was wrong. Indeed, that is likely why he did not present an insanity defense or seek an insanity jury instruction at trial.

### C. Deterrence and Just Punishment.

Defendant claims that the minimum possible sentence, including zero months of incarceration for attempted murder of a federal agent, will provide sufficient deterrence because he never spent time in jail before shooting S.D. in a deliberate attempt to kill her. Doc. 218, pp. 20-21. He claims that he is no longer the same person who shot S.D., and therefore that it would be unjust to sentence him as if he were. *Id*. at 21-22. Neither argument has merit.

Deterrent effect is important for this sentencing regardless of whether Defendant will be

---

[8] Trial transcript pages 591-92 appear on pages 140-41 of the January 11, 2023, trial session transcript file.
[9] Trial transcript pages 558-62 appear on pages 107-11 of the January 11, 2023, trial session transcript file.

able to possess a firearm because the concept of deterrence in § 3553(a) includes the general deterrent effect of a criminal sentence upon others deciding whether to commit this crime in the future. To paraphrase the Court of Appeals for the Tenth Circuit, the UNITED STATES "fail[s] to see how a non-custodial sentence [for the attempted murder count] would deter [future motorists] from [attempting to murder police officers during traffic stops]. General deterrence comes from a probability of conviction and significant consequences. If either is eliminated or minimized, the deterrent effect is proportionately minimized." *United States v. Morgan*, 635 Fed. Appx. 423, 450 (10th Cir 2015).

Regarding just punishment, Defendant argues that he now understands that it is incorrect to lie in wait to attempt to murder police officers. Doc. 218, pp. 21-22. More specifically, he represents to the Court that "[h]e no longer possesses the same ideations that drove him to shoot at [S.D.] and is functionally a different man." *Id*. at 22. But Defendant has not explained which past beliefs he no longer holds. Does he now acknowledge that his brother is guilty of the crime for which he is incarcerated? No, he does not include any such revelation in his sentencing filing. Does he now acknowledge that S.D. acted entirely appropriately during the traffic stop, including her response to his attempt to murder her? No, he continues to accuse her of wrongdoing in his sentencing memorandum.[10] Has he somehow become unconcerned with police uses of force against civilians? There is no reason to believe that he has.

Defendant wants to avoid punishment, as is natural for someone facing 10-30 years of

---

[10] Doc. 218, pp. 4 "[S.D.'s actions] were incredibly reckless." *See also id*. at 12-13 (detailing Defendant's concern about S.D.'s allegedly unjustified police behavior).

imprisonment. However, Defendant has not demonstrated any genuine remorse for the harm he has caused or acknowledged that his own malice towards police and willingness to kill others for imagined slights is what put him in his current position. For those reasons, the § 3553(a) factors of deterrence and just punishment demand a substantial sentence for Count 1, attempted murder of a federal agent.

### III. Conclusion

For the reasons summarized above, the UNITED STATES respectfully recommends that the Court sentence Defendant to a term of 240 months of imprisonment for the attempted murder of a federal agent charged in Count 1, and a consecutive term of 120 months imprisonment for Defendant's discharge of a firearm during the commission of that crime of violence as charged in Count 4. This sentence represents a very substantial downward variance from the Guidelines advisory imprisonment range for an Offense Level 45 crime, which sufficiently incorporates Defendant's mental health problems, difficulties while incarcerated including the COVID-19-related difficulties, and lack of prior criminal history. A further downward variance, including but not limited to a 100% downward variance to zero incarceration for Count 1 as Defendant requests, would not be justified. The UNITED STATES also respectfully recommends that the Court impose a term of supervised release to follow the custodial sentence, restitution, and forfeiture as listed in the Superseding Indictment and stipulated in the Plea Agreement.

The filing of this sentencing memorandum in CM/ECF caused a copy to be served on Devon Fooks, Esq., and Amanda Lavin, Esq., counsel for Defendant.

RESPECTFULLY SUBMITTED this 5th day of October, 2023.

                                              ALEXANDER M.M. UBALLEZ
                                              United States Attorney

                                              *Electronically filed October 5, 2023,*
                                              PAUL J. MYSLIWIEC
                                              NICHOLAS S. MOTE
                                              Assistant United States Attorneys
                                              P.O. Box 607
                                              Albuquerque, New Mexico   87103
                                              (505) 346-7274